SMALL, J.T.C.
This written opinion amplifies my oral opinion of April 7, 1995.
Manuel Lorenzo (“Lorenzo”) appeals from a determination of the Director of the Division of Taxation (“Director”) that he was personally responsible under N.J.S.A 54A:9-6(f) & (l) for the failure of M & L Construction Co., Inc., (“M & L”) to remit $103,302.39 tax (plus penalty and interest) withheld from employee wages under the New Jersey Gross Income Tax Act. N.J.S.A 54A:1-1 to :9-27 for the years 1989 through 1992. I have determined that Lorenzo is not personally responsible for M & L’s failure to remit taxes and accordingly, I cancel the Director’s assessment against him.
I.
Lorenzo was born and educated in Spain. He left school at the age of 12. He worked in construction in Spain and Germany and was in the army. He immigrated to the United States early in 1968. Within a week of his arrival in the United States he began work in a factory and later in 1968 he began working in construction, a trade in which he continued working.
Lorenzo met Louis Lovejoy (“Lovejoy”) while they were both working at a New Jersey construction company where Lovejoy was an estimator and superintendent of construction and Lorenzo was a laborer and foreman.
In 1979 Lovejoy had approached Lorenzo indicating that it would be advantageous for them to form a minority-owned construction company to bid on public contracts. Lovejoy could not qualify as a minority owner; Lorenzo could. Despite Lorenzo’s misgivings about undertaking such a venture, given his inability to read and write English, Lovejoy assured Lorenzo that he, Love- *565 joy, would take care of the paperwork. They formed M & L. Lorenzo held a 51% stock interest and the title of president of the corporation. Lovejoy held the remaining 49% stock interest and was vice president and secretary.
Several witnesses including Lorenzo testified as to the actual roles that Lorenzo and Lovejoy played in the operation of M & L. Lovejoy ran the office and supervised everyone except laborers, who were supervised by Lorenzo. Lovejoy controlled the finances of the company, bid jobs, secured bonds, supervised bookkeeping, authorized all payments above $500 and signed most of the checks. From time to time, Lorenzo signed checks as directed by Lovejoy. Lorenzo signed loan documents, gave personal guarantees and signed other business papers as directed by Lovejoy or as guided by other corporate employees. This was necessary as Lorenzo could not read English.
Lorenzo and Lovejoy received salaries of approximately $70,000 per year. There was another corporate employee, Tom Johnson, who seems to have been paid slightly more than Lorenzo, at least in some of the years. Lorenzo and Lovejoy each had company ears.
From 1987 to 1991 Lovejoy received approximately $600,000 in payments from M & L. His wife’s nurse had been paid in part by M & L, his chauffeur was paid by M & L, and his mortgage was paid by M & L. Lorenzo’s mortgage was also paid by M & L (Lorenzo had loaned M & L the $45,000 proceeds from a mortgage taken on a home he had owned free and clear. There was no evidence at trial that Lovejoy ever contributed any money to M & L).
The record is not clear, but sometime in the late 1980’s or early 1990 Lorenzo increasingly had to press Lovejoy to pay bills so that suppliers would continue delivering materials to construction sites and subcontractors would continue working. Despite Love-joy’s assurance that the company was doing well, it seemed to be very slow in paying its bills.
*566 In 1992 the company received notice that it was delinquent in its payment of federal income tax withholdings from its employees. John Crowley (“Crowley”), the financial vice president of M & L, was asked by Lovejoy to prepare a response to a federal IRS questionnaire in which his draft indicated that Lovejoy was responsible for the payment of these taxes. Lovejoy instructed Crowley to change the form to indicate that Lorenzo was responsible and also instructed Crowley not to tell Lorenzo about it. Nevertheless, Crowley told Lorenzo. Lorenzo refused to sign the document and sought legal and accounting help to resolve their problems.
During the course of the investigation by newly hired accountants and lawyers, Lorenzo, the 51% shareholder and president, was advised that since Lovejoy was not making books and records available, that Lovejoy should be fired. Lovejoy was fired by Lorenzo. (A Newark police officer had been called to witness the firing because it was known that Lovejoy kept a .45 caliber handgun in his desk. At the time of the firing the police officer confiscated the gun.).
A thorough examination of the books revealed that Lovejoy had been taking cash and paying personal expenses at about ten times the rate of Lorenzo’s salary and benefits. Based on the advice of counsel, Lorenzo sold his 51% interest in M & L to Lovejoy for $100,000 which proceeds he gave to his son.
Despite his controlling stock interest and title of president, Lorenzo did not assert any authority in the company until he fired Lovejoy. Lorenzo testified that he trusted Lovejoy, did what Lovejoy told him to do, and signed what Lovejoy told him to sign, in the belief that it was all in the best interests of M & L. Employees of M & L, those who contracted with M & L, and Lorenzo all testified that Lovejoy ran the company’s office and business functions. He was seen as “the boss”. Although Lorenzo had the title of president, he was the field supervisor of laborers; other more skilled field workers were supervised by Lovejoy. Lorenzo would occasionally show up in the office, perhaps for an hour at the end of the day, to review and plan field *567 activities and sign papers and checks at Lovejoy’s direction. Lorenzo, perhaps mistakenly, relied on Lovejoy to handle all business and tax functions of M & L.
I observed Lorenzo on the stand and heard his testimony. I believe him to be an honest, hard-working laborer and construction supervisor unable to read or write English. His testimony and the testimony of others revealed him to be unsophisticated in business matters, recklessly trusting of Lovejoy and, in effect, little more than a field supervisor in the operations of M & L. He was used as a “front” for M & L so that it could qualify as a minority contractor. Despite his paper position, he played a subservient role to Lovejoy at M & L. Because he innocently, perhaps ignorantly, trusted Lovejoy, Lovejoy was able to divert a disproportionate share of the company's assets to himself while ignoring corporate obligations, including taxes.
II.
Individual liability for corporate employee withholding taxes under the New Jersey Gross Income Tax is governed by statute:
If any employer, without intent to evade or defeat any tax imposed by this act or the payment thereof, shall fail to make a return and pay a tax withheld by him at the time required by or under the provisions of section 54A:7-4, such employer shall be liable for such tax and shall pay the same____
[N.J.S.A 54A;9-6(f).]
For purposes of subsections (f), (g), (h) and (i), the term person or employer includes an individual, corporation or partnership or an officer or employee of any corporation (including a dissolved corporation) or a member or employee of any partnership, who as such officer, employee, or member is under a duty to perform the act in respect of which the violation occurs.
[N.J.S.A. 54A:9-6(I).]
The question that must be resolved by this court is whether Manuel Lorenzo was “under a duty” to collect and remit the New Jersey gross income tax withheld from the wages of M & L employees. In New Jersey only one reported case has dealt with this issue. Cooperstein v. Director, 13 N.J.Tax 68 (Tax 1993), aff'd, 14 N.J.Tax 192 (App.Div.1994), petition for certif. denied, 140 N.J. 329, 658 A.2d 728 (1995). In another case, the related issue of personal liability under the New Jersey Sales & Use Tax *568 Act N.J.S.A 54:32B-1 to -29, was analyzed with reference to Cooperstein. See Skaperdas v. Director, 14 N.J.Tax 103 (Tax 1994), appeal filed, A-6569-94T3 (May 10, 1995), Cooperstein established nine factors to be analyzed with respect to personal liability for corporate trust fund taxes. It is helpful to analyze each of'those nine factors as they relate to Lorenzb.
1. Contents of the corporate bylaws. There is no question that under M & L’s bylaws, Lorenzo, as president, had general responsibility for the payment of taxes as he had general supervisory responsibility for all activities of the corporation.
2. Status as an officer and/or stockholder. Lorenzo was the President and held 51% of the stock. On paper he was in complete control of M & L.
3. Authority to sign checks and actual exercise of this authority. Lorenzo had the authority to sign checks. He did sign checks, but his role was somewhat different than a person who normally signs cheeks because he couldn’t read English. He signed what he was told to sign. Lovejoy had given instructions to those who actually prepared the checks that Lorenzo was not to sign a check in excess of $500 unless approved by Lovejoy.
4. Authority to hire and fire employees and actual exercise of this authority. Clearly Lorenzo had authority to hire and fire employees. In fact he only hired and fired laborers. The evidence adduced at trial indicates that, as to other employees, when Lorenzo tried to get involved, he was overruled by Lovejoy.
5. The responsibility to prepare and/or sign tax returns. Other than his paper position as president, it is clear that in the operation of M & L Lorenzo had nothing to do with taxes.
6. Day-to-day involvement in business or responsibility for management. Lorenzo really had no involvement in the day to day operations of M & L except to the extent that he was involved in field operations.
7. Power to control payment of corporate creditors and taxes. On paper Lorenzo had this power. In fact, Lorenzo did not have that power and Lovejoy did. This is why Lorenzo had to plead *569 with Lovejoy to get suppliers and subcontractors paid in order to maintain delivery of supplies and work of subcontractors.
8. Knowledge of failure to remit taxes when due. I find that Lorenzo had no knowledge of M & L’s failure to remit taxes until Crowley spoke to him about the IRS inquiry. It might normally be expected that someone like Lorenzo who was signing documents and checks would or should have knowledge of the corporation’s failure to remit taxes. Lorenzo’s inability to read English makes his position that he lacked knowledge of M & L’s tax problems more credible than would be the case with an individual who could read and write English.
9. Derivation of substantial income and benefits from corporation. Lorenzo was paid a salary of $70,000, had a car and some other benefits. These amounts do not seem to be out of line as compensation for Lorenzo as a labor foreman, the use of his Hispanic surname, and his personal guarantees of loans and other corporate obligations.
This nine part analysis, as I indicated at trial, is not something to be weighed on an arithmetic basis: if five factors point to liability, an individual is responsible; if only four factors point to liability, he is not. The nine factors are each examined and then the court must make a qualitative determination based on the totality of the analysis.
Comparing Lorenzo to Cooperstein in Cooperstein v. Director; supra, I find that Lorenzo was less responsible. Cooperstein makes the crucial distinction between a duty to act and authority to act and holds that mere authority is not sufficient to impose personal liability. Duty alone imposes the liability. 13 N.J.Tax at 79-82. There is no question that Lorenzo had authority to act for M & L. See also Skaperdas v. Director, Div. of Taxation, supra.
Joseph Cooperstein became involved with a floor covering business, Robert W. Bahr & Sons, in order to facilitate the retirement of its proprietor, Robert Bahr. Cooperstein, supra, 13 N. J.Tax at 71-72. To that end, Cooperstein drafted a business plan whereby the business was incorporated so that three of Robert Bahr’s *570 family members could purchase it. Cooperstein became one of two incorporating directors and corporate president, as well as controlling shareholder via revocable proxy. Id. at 72. Although the by-laws gave him, as president, authority to manage the business, Cooperstein’s sole function was to obtain financing so that the family members could purchase the business from Bahr. Id. at 73. Cooperstein was not involved in day-to-day operations and had no substantial involvement in the corporation’s finances, including tax payments, until becoming owner of two-thirds of the stock following departure of two of the family members. Id. at 75-76. He was unaware of the unpaid state taxes until that time. Ibid.
Lorenzo’s position in M & L was limited as was Cooperstein’s position at Robert W. Bahr and Sons. His knowledge and role in the corporation were more limited than Cooperstein’s with respect to the business and taxes of the corporation. Cooperstein was a sophisticated businessman; Lorenzo was an unsophisticated laborer. Like Cooperstein, Lorenzo was placed in his position for a specific purpose: Cooperstein to secure financing, Lorenzo to be a front for minority contracting. In each case, others were responsible for the payment of bills and taxes. Although Lorenzo signed checks and Cooperstein did not, Lorenzo only signed checks at the direction of Lovejoy, who had given directions that no check was to be prepared in excess of $500 for Lorenzo’s signature without Lovejoy’s approval. Although Lorenzo had authority to remit taxes, the duty clearly was with others in the office under Love-joy’s supervision. Although Lorenzo received a salary and Coo-perstein did not, Lorenzo was paid less than at least one other corporate employee. Although there was no testimony as to what a field supervisor would be paid, given that he had lent his Hispanic surname to the corporation, guaranteed loans, gave Lovejoy a free hand to run the corporation, in fact, to use it as his personal bank account, $70,000 a year does not seem out of line. Testimony at trial revealed that a $70,000 per year salary was well below the standard of the construction industry for the president of a construction company, like M & L, which had annual sales of $10,000,000.
*571 There can be more than one responsible officer in a corporation. See Skaperdas v. Director, supra, 14 N.J.Tax at 112-13; Barnett v. IRS, 988 F.2d 1449 (5th Cir.), cert. denied, — U.S.-, 114 S.Ct. 546, 126 L.Ed.2d 448 (1993). Clearly, Lovejoy is responsible based on the evidence that I heard.
Despite his title and shareholdings, Lorenzo was not an equal partner. He had legal authority based on the papers, but based on an examination of the evidence, he was not capable of running this business, he did not run this business, no one expected him to run this business, and he did not hold himself out as running this business. Only when disaster struck did Lorenzo seek the counsel he needed. Lorenzo worked for the company as a laborer and foreman, lent the company his Hispanic surname, and lent the company his money. Although Lorenzo had paper authority, all power was in Lovejoy. Lorenzo had no duty to act for M & L in the area of tax obligations. Until the IRS knocked on the door and Mr. Crowley, against Lovejoy’s directions, advised Lorenzo of the company's tax problems, Lorenzo had no knowledge or understanding of M & L’s tax obligation or tax defaults.
Harry Skaperdas was a director and officer of a fur company. He received dividends, used corporate losses for personal tax deductions, and obtained life insurance from the company. Ska-perdas, supra, 14 N.J.Tax at 107, 111. His sole involvement consisted of signing corporate documents, performing tailoring during the busy season, and assisting the sales staff. The rest was left to his three “partners”. Id. at 108. He was not responsible for hiring employees or preparing tax returns. On occasion he did sign tax returns. Although he had the authority to control payment of creditors and tax liabilities, he did not exercise it, and he had no knowledge of unpaid taxes. Id. at 110-11.
I cannot imagine that there will be many cases like this one. Based on the evidence in this case and that in Skaperdas, I would conclude that Lorenzo, like Harry Skaperdas, the tailor, was an unsophisticated individual whose corporate position made him, on cursory examination, a responsible officer. The actual involvement of both Lorenzo and Harry Skaperdas in the running of the *572 corporations’ businesses, coupled with their lack of sophistication, the actual role of others in the running of the corporations, and in Lorenzo’s case, his inability to read and -write English, absolve Lorenzo as it absolved Harry Skaperdas of personal liability.
The Director cites Barnett v. IRS, supra, 988 F.2d 1449. Barnett, whom the court found to be a responsible person under federal law[1], was a 20% director, and officer of a drilling company which he formed with a business associate. His primary responsibility was directing day-to-day drilling operations; he purchased supplies as well as hired, fired, and supervised employees. Id. at 1450. His associate, Anderson, was a CPA who took care of the company’s financial affairs, although Barnett reviewed bills, conferred on major business decisions, and recommended which creditors should be paid. Id. at 1451. Barnett also had the authority to sign checks without Anderson’s permission. Ibid. When the company began experiencing difficulties, Barnett became more involved in the financial side and eventually discovered unpaid federal trust fund taxes. Id. at 1452. However, Barnett, who eventually obtained control of the company’s finances, did not use incoming payments to satisfy outstanding tax liabilities, but to meet payroll and make payments of approximately $70,000 to himself and $20,000 to “cash”. Ibid. The company then went bankrupt.
I find Lorenzo’s involvement in M & L substantially different from Barnett’s. Lorenzo did not decide which bills would be paid, did not participate in discussions regarding financing and acquisition of equipment, and did not negotiate loans. Lorenzo did not *573 play a central role in M & L’s day to day operations. Unlike Barnett, Lorenzo did not choose to pay others rather than meet the corporation’s tax liabilities or write checks to himself for $70,000 or to cash for $20,000.
Attached as an appendix to this opinion is a chart analyzing and comparing the activities of Messers. Cooperstein, Harry Skaper-das, Barnett, and Lorenzo with respect to each of the nine factors that Cooperstein has established as the standards to be applied in determining whether an individual is personally liable for New Jersey gross income taxes when they are not collected and remitted by a corporation.
Lorenzo was not under a duty to act and cannot be held personally responsible for the unremitted withholding taxes of M & L.
The assessment of the Director against Manuel Lorenzo will be canceled.
*574 [[Image here]]
*575 [[Image here]]

 The standards for imposing personal liability on corporate officers and employees under Internal Revenue Code § 6672(a) and the New Jersey Gross Income Tax, NJ.S.A. 54A:9-6(f), differ: the Code imposes liability only if there is a willful intent; the Gross Income Tax has no such requirement. (Note however, there is an additional liability imposed for "willful” acts under the New Jersey Gross Income Tax. NJ.S.A. 54A:9-6(g)). Nevertheless, the definitions of responsible individuals are identical in the two statutes. NJ.S.A. 54A:9-6(/) and 26 U.S.C. § 6671(b). Both impose the requirement that an individual must be "under a duty to perform the act in respect of which the violation occurs" (emphasis added). See Cooperstein, supra, 13 N.J.Tax at 80.